IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 16, 2005

## STATE OF TENNESSEE v. ALBERT JAMES SAAVEDRA

**Direct Appeal from the Circuit Court for Humphreys County**
**No. 10385   Robert E. Burch, Judge**

———————————

**No. M2004-02889-CCA-R3-CD - Filed March 13, 2006**

———————————

The Defendant, Albert James Saavedra, was indicted on one count of first degree murder and one count of attempted first degree murder.  He was convicted for the lesser-included offense of voluntary manslaughter and for the indicted offense of attempted first degree murder.  The trial court reduced the conviction for attempted first degree murder to attempted second degree murder, finding that the evidence was insufficient to prove that the Defendant acted with premeditation.  The trial court also sentenced the Defendant to an effective sentence of fourteen years in the Department of Correction.  The Defendant appeals, contending that: (1) the evidence is insufficient to sustain his conviction for attempted second degree murder; (2) the trial court erred by not instructing the jury on aggravated assault as a lesser-included offense of attempted first degree murder; (3) the trial court erred when it took his motion for judgment of acquittal under advisement and when it denied this motion with respect to attempted second degree murder; and (4) the trial court erred when it denied his Rule 33(f) motion.  Finding that there exists no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, JJ., joined.

William B. "Jake" Lockert, III (at trial and on appeal) and Haylee Bradley (at trial), Ashland City, Tennessee, for the appellant, Albert Saavedra.

Paul G. Summers, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Dan Mitchum Alsobrooks, District Attorney General; and Lisa C. Donegan, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the death of Danny DeBerry and the stabbing of his wife, Amanda Joy

DeBerry, which occurred during the early morning hours of November 15, 2002. At the Defendant's trial, the following evidence was presented:

On November 14, 2002, Rebecca Dyal was working from 3:00 p.m. until approximately 1:30 a.m. at Montana's Saloon, a bar that serves beer only and is located in New Johnsonville. Between 9:00 p.m. and 10:00 p.m., she saw a man that she did not recognize, but later identified as the Defendant, come into the bar alone, and she noted that he was "[a] rather large guy" who wore a "darker flannel" shirt, jeans, and a baseball cap, and had a gap between his front teeth. Dyal recalled that the Defendant began drinking Mike's Hard Lemonade, and he played pool the majority of the time that he was there, which she noticed because he played "one-handed." Dyal recalled that, at some point, the Defendant left the bar, but he returned approximately fifteen minutes before the bar closed, and she served him a drink. Later, Mr. and Mrs. DeBerry came into the bar and they were talking to the Defendant. Dyal said that, mostly, the Defendant and Mr. DeBerry were talking and they seemed "[l]ike they had known each other and they were friendly," but Mrs. DeBerry engaged in the conversation only "[a] little bit . . . ." Dyal testified that, at some point, she heard an argument between Mr. and Mrs. DeBerry and told them that they were going to have to stop arguing or leave the bar, and the Defendant told her that they were okay and were going to work things out. The Defendant and the DeBerrys were the last patrons to leave the bar, and, after they left, Dyal saw them standing and talking in the parking lot near two vehicles. She saw a compact, teal green or sea foam green car similar to a Geo with two bodies in it and a white boxy vehicle, similar to a Volvo, but she could not see if there was anyone in the white car. When Dyal left the bar between 1:40 a.m. and 1:50 a.m., the two cars were gone.

Dyal identified the Defendant in court and said he looked different in court than on the night of November 14, 2002, because it looked like he had lost a lot of weight and both his hair and facial hair were different. When she was contacted by police to view a photographic lineup, she was unable to identify the Defendant's picture in the lineup, but she agreed that, despite this, she had no doubt that the Defendant was the man that she saw at the bar that evening with the DeBerrys.

On cross-examination, Dyal recalled that the Defendant and the DeBerrys all appeared to be intoxicated, and she heard Mr. DeBerry ask the Defendant if he wanted to go drinking, and there was some discussion about going to Jackson. Dyal agreed that she saw no indication that the Defendant was fighting or arguing with Mr. DeBerry. She testified that, when the DeBerrys were arguing, the Defendant told her nicely that the DeBerrys were married, that the three had just come from The Sidetrack,[1] another bar across the street, and that they could take care of things on their own. Dyal said that she did not know what the DeBerrys were arguing about, and the confrontation between the two was not physical.

Dennis Brown recalled that, on November 14, 2002, he was at The Sidetrack with his girlfriend, Pam Board, where he knew almost everyone that came into the bar. He remembered that,

---

[1]We note that, in the record, Mrs. DeBerry refers to this establishment as "Sidetrack bar." Other witnesses refer to the bar as "The Sidetrack." For consistency, we will always refer to this bar as "The Sidetrack."

during that evening, he was sitting at the bar when he saw the Defendant come into the bar alone. Brown noticed the Defendant because he was "a pretty big guy," weighing "at least" 240 or 250 pounds. Brown recalled that the Defendant was wearing a light colored shirt, either blue or white, a baseball cap, jeans and work boots. When the Defendant came into the bar, the Defendant ordered drinks for everybody in the bar, but Brown did not realize this until the bartender gave him a beer and said that it was from "Will," pointing to the Defendant.

Brown recalled that, a little later, the DeBerrys, whom he knew, came into the bar, and Mrs. DeBerry was sitting at the end of the bar playing a video game while Mr. DeBerry was playing pool. Brown saw the Defendant lean across a barstool to talk to Mrs. DeBerry, and it appeared to him that the Defendant was flirting with Mrs. DeBerry. Brown said that Mrs. DeBerry acknowledged the Defendant but kept playing her game. At one point, Brown played pool with the Defendant, who shot one-handed and was very good at pool. The Defendant told him that he was either from Bangor, Maine, or had just left work there, and he was in New Johnsonville looking for work. The Defendant continued to buy drinks for everyone and was still at the bar when Brown left around 12:30 a.m. Brown agreed that he later learned that the DeBerrys had been stabbed, and the police asked him to view a photographic lineup, during which he picked out the Defendant's picture from two lineups as being the man he saw at The Sidetrack that evening. On cross-examination, Brown testified that he had known Mr. DeBerry all his life, and he knew Mr. DeBerry's temperament. Brown admitted that he told a TBI agent that the Defendant was "handsy" with Mrs. DeBerry, and, had Mr. DeBerry seen this, he would have confronted the Defendant about that regardless of the Defendant's size. Brown agreed that he did not know that Mr. DeBerry was manic depressive or that he was not taking medication on the night of this incident.

Pamela C. Board testified that she went to The Sidetrack on November 14, 2002, with Brown, and she noticed the Defendant come into the bar that evening because she had never seen him before. Board said that the Defendant, who introduced himself as "Will," came into the bar, set a $100 bill on the bar, and told the bartender that he wanted to buy the rounds until it was gone. Board recalled that the Defendant was wearing a baseball cap, a white plaid shirt, and blue jeans. Board testified that Mr. and Mrs. DeBerry were also at the bar that evening, but she did not recall whether they arrived before or after the Defendant. Board noticed the Defendant play pool because he only used one hand while playing, and she had never seen that before. She also noticed the Defendant talking to Mrs. DeBerry but did not find that unusual. Board recalled that she identified the Defendant's picture from two different photographic lineups. On cross-examination, Board agreed that the Defendant was being friendly with everyone. Board did not see Mr. and Mrs. DeBerry arguing, and she did not see them embracing or hugging either.

Mrs. DeBerry testified that, in November 2002, because she and Mr. DeBerry were having financial difficulties, they had recently moved from Jackson, Tennessee, with their two youngest daughters into a house that they recently inherited in New Johnsonville, Tennessee. Mrs. DeBerry testified that she and Mr. DeBerry had been married for twenty-five years, and, while they loved each other very much, they had difficulties "like all married couples." Mr. DeBerry had a problem with alcohol, for which he had received treatment a couple of times. Mrs. DeBerry became dependant

on a pain medication, Hydrocodone, and she was terminated from her job when she entered treatment for her addiction. Mrs. DeBerry said that the stress of her losing her job, the financial difficulties, and her addiction took its toll on Mr. DeBerry, and he was diagnosed as manic depressive in 2001. When Mr. DeBerry was "manic" he would talk long distance on the phone for long periods of time, spend money on things that "didn't make any sense," and leave the house and not come home for a whole day, which was unusual. Mrs. DeBerry recalled that Mr. DeBerry did not like the medication that he took for this ailment because it made him sleepy, feel sick, and gain weight.

The week before November 14, 2002, Mr. DeBerry left the DeBerrys' home in New Johnsonville, and Mrs. DeBerry did not know where he was until she later learned that he was in Jackson. She said that during or shortly after this he was arrested for stealing their neighbor's car. Mrs. DeBerry borrowed money to pay Mr. DeBerry's bond, and he came home with her, but this situation caused some friction between them. Mrs. DeBerry said that in the next few days she and Mr. DeBerry cashed in a 401(k) and received $6,400, which helped their financial situation. She said that things seemed to have turned around, and they bought a used Volvo in part because Mr. DeBerry's truck had been stolen.

On November 14, 2002, Mr. and Mrs. DeBerry[2] went out to dinner with two of their daughters to celebrate them getting a new car, Mr. DeBerry's obtaining a new job, and the family being together. Mrs. DeBerry said that everyone was in a good mood at dinner, and they left dinner around 8:30 p.m. When they returned home, Mr. and Mrs. DeBerry began talking about where Mr. DeBerry had been while in Jackson and what he had been doing. Mr. DeBerry mentioned a woman that Mrs. DeBerry knew of but had previously thought that Mr. DeBerry only met when he was trying to find out who stole his truck. From what Mr. DeBerry told her, Mrs. DeBerry assumed that Mr. DeBerry had met this woman before his truck was stolen and that the two had a romantic relationship. Mrs. DeBerry said that she got upset and cried, and the couple argued. She wanted to get away from the house because she was angry, and, after visiting some relatives, she decided to go see her brother who she thought was at The Sidetrack. She went home, changed clothes, got Mr. DeBerry, and went to The Sidetrack. Mrs. DeBerry said that she told her daughters that she and Mr. DeBerry were going to talk because she did not want them to know that they were going to a bar.

When Mrs. DeBerry arrived at The Sidetrack, she took a seat at the bar and saw the Defendant who was sitting towards the end of the bar. The Defendant moved down a seat so that Mrs. DeBerry could sit next to Mr. DeBerry. Shortly after they sat down, Mrs. DeBerry heard Mr. DeBerry comment on what the Defendant was drinking, which was Mike's Hard Lemonade, saying "that's pretty good stuff isn't it?", and the Defendant responded "yes." Mrs. DeBerry said that she was pretty quiet while at the bar, but she talked to some people that she knew.

Mrs. DeBerry recalled that Mr. DeBerry played pool, and she noticed the Defendant playing pool using only one hand. Mrs. DeBerry recalled that she talked to the Defendant, whom she knew

---

[2]Because both victims and their daughters all have the same last name, we will refer to the two victims as Mr. and Mrs. DeBerry and to the daughters by their first names, Jenna and Danielle.

-4-

as "Will," when he came to sit next to her at the bar. She said that they discussed their families, and the Defendant asked if she could guess his age and showed her his driver's license, which she recalled listed him as being born in 1970. The Defendant told her that he was here from Maine working for "TVA," and his work involved the environment. Mrs. DeBerry said that she told the Defendant that she was married to Mr. DeBerry, and the Defendant responded, "I like him." When she asked the Defendant what he meant, the Defendant explained "he's just kind of laid back, just his demeanor." The Defendant told her that he liked her eyes and that she looked like she had a halo over her head. She said that she was flattered, but she thought that it was strange that he said those things when she was sitting at a bar with a beer and a cigarette. Mrs. DeBerry said that, at one point, she was turned on her stool looking at her husband, and the Defendant put his hand on her leg and turned her stool so that she was facing him. Throughout the evening, Mrs. DeBerry did not talk to Mr. DeBerry "a whole lot" because she was still upset with him.

Mrs. DeBerry recalled that they did not leave the bar until it closed at around 1:00 a.m. Mrs. DeBerry recalled that, when the bar closed, she and Mr. DeBerry walked out, and she went to get in the car. When she looked, Mr. DeBerry was going across the street towards Montana's, another bar, and she called to him "Let's go home." He responded that he wanted to go to Montana's to see about playing some more pool. Mrs. DeBerry drove over to Montana's, and Mr. DeBerry had already gone inside, and she could see him going into the bathroom. She said that she waited for him to come out, and she loudly told him "let's go, let's go home." Mrs. DeBerry agreed that she was angry and upset, and the bartender told them that they needed to leave because it was time to close. As she and Mr. DeBerry were leaving, she saw the Defendant sitting at the bar, and Mr. DeBerry made a comment about how Mrs. DeBerry was upset with him. She agreed that Mr. DeBerry was joking and making light of the situation because it was not serious. Mrs. DeBerry said that she left the bar and got into her car, and Mr. DeBerry stopped and talked to the Defendant. Mr. DeBerry started to get into the passenger's side of her car when the Defendant came to her driver's side window and asked if he could drive Mr. DeBerry home so that they could have a "man-to-man talk." Mrs. DeBerry assumed that the Defendant wanted to "help with our marital situation, at the time, just, you know, us being [in an] argument." Mrs. DeBerry looked at Mr. DeBerry who indicated that it would be "okay," and she told the Defendant that she would follow his car because she was afraid that Mr. DeBerry would go somewhere else to drink.

Mrs. DeBerry said that Mr. DeBerry expressed no concern about getting into the Defendant's car, which was a small "kind of [] blueish-green turquoise color." She said that Mr. DeBerry "befriended everybody. . . . Everybody liked him." Further, it was not abnormal for someone to come back to the house with them to talk. Mrs. DeBerry testified that she followed the Defendant's car, but she was a little ways behind them because she wanted to drive slowly since she had consumed three beers. She estimated that she arrived home between 1:30 a.m. and 1:40 a.m., and, when she arrived at her house, Mr. DeBerry and the Defendant were standing by the side of the house near the Defendant's car, which was parked at an angle at the side of the driveway and a little on the grass. Mrs. DeBerry thought that it was strange that the Defendant did not just pull straight into the driveway but parked at an angle. She sat in her car and cried a little bit because she and Mr. DeBerry had not had a chance to talk, which was something that was important to her. After she was

there for "just a minute," Mr. DeBerry came over to the car, opened her door, and said "come on, baby, let's go in," and he carried her over to the door that led inside their garage.

After Mr. DeBerry carried her to the side door, she went into the house, and he was still standing at the door near the Defendant. She checked on the girls, who were sleeping in the same room and then went back to the bedroom that she shared with Mr. DeBerry. She said that she muted the television, put her purse away, and lay down on the bed. She remembered that she was still clothed and was crying as she drifted off to sleep. The next thing that she remembered was being awoken by Mr. DeBerry screaming for her saying, "[H]elp me, Jo, help me." She said that Mr. DeBerry sounded very distressed, and she knew that something was wrong. She went to the "garage room," and, when she opened the door, she saw Mr. DeBerry and the Defendant struggling over a spear gun that Mr. DeBerry used to fish. Mrs. DeBerry recalled that there was a lot of blood in front of the door, and she saw some blood on Mr. DeBerry's neck and face. She went straight to Mr. DeBerry, and the Defendant and stepped in between them. She took the spear gun, and Mr. DeBerry fell back. Mrs. DeBerry described the Defendant, stating, "He just had this wild look on his face, in his eyes, just . . . like . . . something wild."

Mrs. DeBerry testified that she could not understand what could have happened, and she recalled asking the Defendant "why did you do this? I mean, what happened? . . . I thought you were our friend." She remembered the Defendant jabbing or lunging at her, but she did not remember ever seeing the knife. She tried to reason with the Defendant and screamed at him to leave, mindful of the fact that she had her two teenage daughters in the house. One of her daughters, Danielle, came to the door during this time, and the Defendant told Danielle to get back in the house and close the door. Mrs. DeBerry told Danielle to call 9-1-1. After Danielle went back into the house, the Defendant turned and started turning the doorknob, and then he left. Mrs. DeBerry then went to her husband and attempted to talk to him, telling him that she loved him, and then tried to attend to some of his wounds, which she noticed were severe. She said that Mr. DeBerry's breath was shallow and labored. During this, Mrs. DeBerry's daughter, Jenna, came to the door, and Mrs. DeBerry told her not to come out there. She heard, and answered, questions that Danielle was relaying to her from the 9-1-1 operator.

Mrs. DeBerry said that the EMTs arrived and attended to her husband. She said that she did not realize that she was hurt until she was standing over the patrol car holding her side and realized that she had two stab wounds to her side and a cut across her throat. She noticed later that, when the Defendant cut her throat, he also cut some of her hair near her neck.

Mrs. DeBerry acknowledged that her medical records showed that, at one point while she was in the hospital, she said that she felt "guilty" concerning her husband's death. She explained that she felt guilty because it was her idea to go out that night. She said that she had gone over so many "ifs" in her mind, such as if she told Mr. DeBerry that he could not go with the Defendant and had to come home with her. Further, she agreed that she felt guilty because the last time that she spoke with her husband she was angry with him. Mrs. DeBerry agreed that the Defendant caused both her and her husband's injuries.

On cross-examination, Mrs. DeBerry said that, when she got $6,400 from her 401(k), she and Mr. DeBerry opened both a savings account and a checking account at First Bank, and they deposited $3,000 into each account. Mrs. DeBerry was aware that Mr. DeBerry had another account at that bank that was overdrawn, but she did not know how much money was owed on that account. She said that they did not deposit any money into Mr. DeBerry's account that day.

Mrs. DeBerry did not recall making several statements to police, many of which she made shortly after she was stabbed, while she was still in the hospital and sedated. She did not remember telling Officer Edwards that, when she went into the garage room, she saw the Defendant with both the knife and the spear gun. Mrs. DeBerry testified that she did not recall telling Officer Craig that, when she went to the garage, she saw her husband bleeding around the chest and upper body. Mrs. DeBerry also said that she did not recall telling Officer Craig that one of her daughters walked out and saw her getting attacked by the Defendant. She said that she did not recall telling the EMT who attended to her that the Defendant and Mr. DeBerry got into a fight at the bar but that they made up, and the Defendant bought Mr. DeBerry a beer. Similarly, Mrs. DeBerry did not remember telling the EMT that the Defendant told Danielle to go back inside "unless she wanted some." She did not deny that she made any of these statements but said that she did not remember making them.

Mrs. DeBerry confirmed that she assumed that Mr. DeBerry was having an inappropriate relationship with a woman from Jackson, Sheila Jones. She reviewed Agent Derrick Jones's notes from her interview with him and agreed the notes indicated that she told Agent Jones that she had found out that Mr. DeBerry was "sleeping" with Sheila Jones, but she did not recall making this statement. She remembered telling Agent Jones that her argument with Mr. DeBerry was about Sheila Jones, but she did not recall saying that Mr. DeBerry told her that he was having an affair with Jones. She also did not remember telling Agent Jones that the Defendant kissed her on the cheek. Mrs. DeBerry agreed that, if Mr. DeBerry had seen the Defendant flirting with Mrs. DeBerry, kissing her on the cheek or touching her, he would have reacted regardless of the Defendant's size. Mrs. DeBerry agreed that the Defendant was nice to her at the bar and that he was getting along well with everyone.

Mrs. DeBerry recalled that she reported Mr. DeBerry missing the week before November 14, 2002, because he had been gone for three days. She agreed that, while he was "missing," his truck had been stolen, and Mr. DeBerry thought that a couple of guys, whom he had met in a bar, had taken his truck because he had sold them scuba tanks that he falsely said had methanol in them.

Mrs. DeBerry did not recall how long it was between the time that she lay down in her bed and when she heard Mr. DeBerry calling for her to help him. She did not recall exactly what time they returned from the bar and acknowledged that, while she may have told Agent Jones that it was 2:00 a.m., it was, more likely, closer to 1:30 a.m. Mrs. DeBerry recalled that Agent Jones requested the knife blocks from her home, and she recalled that there were two empty spaces, one on each knife block. She explained that Mr. DeBerry often used her knives in his tackle box or to clean fish and that they went missing quite frequently. Further, she said that she may have told Agent Jones that the knives may have been lost in the move from Jackson. Mrs. DeBerry did not remember

telling Agent Jones that the Defendant was "poking" at Mr. DeBerry with the spear gun.

Mrs. DeBerry testified that she and Mr. DeBerry had instances of domestic violence in the past, explaining that "[v]iolence is a harsh word." She said they had arguments where she would slap him or scratch him and sometimes leave a mark and agreed that she was usually the aggressor and that Mr. DeBerry never hit her. She did not recall, but agreed she may have said to Agent Jones, that Mr. DeBerry had gotten more physical with her in the last year. She said that she and Mr. DeBerry would fight more when he was in his manic phase, which would occur when he was not taking his medication. Mrs. DeBerry admitted that she had written several bad checks within the last year before testifying and explained on redirect examination that she had had financial difficulties since her husband's death, and she never wrote a check knowing that there was not going to be enough money in her bank; rather, she just kept poor records. She said that her writing bad checks had no affect on her testimony in court, and she was sure that the Defendant was the man who stabbed her and her husband.

On redirect examination, Mrs. DeBerry said that she was hospitalized when she gave statements to police officers and TBI agents on November 16 and 17. She believed that her medical records accurately reflected that she was given Ativan and Lorzepam, which were anti-anxiety depressants. Further, Mrs. DeBerry said that she was given Percocet, a painkiller depressant, and Oxycodone with Acetaminophen, which is also a depressant. She agreed that all of these drugs would have an effect on her perceptions and memory. Mrs. DeBerry was certain that the Defendant was the only person in the room with her husband before she entered. On recross-examination, Mrs. DeBerry agreed that she was not on pain medications on March 16, which was the date that she gave her deposition for this case. She agreed that she previously testified that she was stabbed after the struggle with the spear gun. She then read a portion of her deposition in which she responded to the question about her two stab wounds by saying, "I *feel* like my wounds were after [I took the spear gun]." (emphasis added). The Defendant's counsel asked what had happened between March 16 and the day of trial to make Mrs. DeBerry convinced that her stab wounds occurred after taking the spear gun. Mrs. DeBerry said that she recalled that the first thing that she did when she entered the garage was to step between Mr. DeBerry and the Defendant. Mrs. DeBerry said that she did not recall telling Agent Jones on December 13, when she was no longer on pain medication, that Mr. DeBerry had told her that he was sleeping with Sheila Jones and about some incidents involving Shelia Jones.

Danielle DeBerry, the victims' daughter, testified that she was living with her parents on the night of this incident, and she described them as having a loving marriage. Danielle confirmed that, the evening of November 14, 2002, she went out to dinner with her mother, father, and sister, and they returned home between 8:00 and 9:00 p.m. After they returned home, her mother and father said that they were going to ride around for a little bit and talk, which was not unusual. Danielle and her sister watched television and then went to bed around 11:30 p.m. The next thing that she remembered was hearing her mother screaming at around 2:00 a.m. She said that she got up and went toward the screaming and heard her mother screaming, "Will, we're your friend" and "Stop," and she saw that the door to the garage was closed. Danielle opened the garage door and saw a man

that she had never seen before, whom she identified as the Defendant, and she saw her mother standing near the Defendant. She said that the Defendant told her to close the door, but she just stared at him. He told her a second time to close the door as he moved toward her, and she closed the door. She heard her mother yell to her to call 9-1-1. Danielle called 9-1-1 immediately, and, when she later went into the garage, she saw that her father had been stabbed. She saw a spear gun lying nearby, which she recognized as belonging to her father. Danielle said that her mother was holding onto her father's body telling him to "hang on."

On cross-examination, Danielle testified that she never saw the Defendant with a weapon in his hand, and she never saw the Defendant attack her mother or father. Danielle conceded that her father was a jealous man, and he would confront someone if he thought that they had been "messing" with her mother. She agreed that this confrontation would be "worse" if her father was not on his medication. Danielle also said that a piece of the Defendant's shirt was attached to the spear gun and she conceded that she had previously told police that her mother and father went to ride around because they were upset with each other.

Jenna DeBerry, also the victims' daughter, said that the victims had a loving marriage. She said that, on the night of November 14, 2002, the victims were having a fight, but it was not a bad fight, and, earlier that evening, they all had gone to dinner and had fun. They arrived back home at around 8:30 p.m., and she went into the living room to watch television. Her parents left to ride around and talk, and she went to bed at around 12:00 a.m. The next thing that she remembered was Danielle leaving the bedroom that they shared and then hearing yelling. She said that she looked out the door and down the hall, and she saw a man. Jenna heard her mother say, "Will, Will, we're your friends," and, "Why are you doing this." Jenna saw the man at the back door struggling to get it open. Then, when he got it open, he went through it, left, and shut the door behind him. She could not see her mother or her father, so she went into the garage, and she saw her mother holding her father saying "Danny, . . . I need you. The girls need you." Jenna said that she saw that her father was hurt and that Danielle was on the phone. She went back and forth between her mother, who was in the garage, and Danielle, who was in the living room, to relay information for the 9-1-1 operator.

On cross-examination, Jenna said that she did not know who let the police into the house when they first arrived. She said that neither she nor Danielle had blood on their hands at this time. Jenna remembered that her mother told her to tell the 9-1-1 operator that the person who attacked her father was driving a blue or bluish-green car. She said that neither she nor Danielle were wearing shoes, and the pictures of the crime scene showed their bloody, bare footprints. Jenna said that the Tennessee Bureau of Investigation ("TBI") never requested their handprints or footprints. Jenna identified pictures that showed a large area of blood by the front of the door, and she did not know how the blood got there or on the outside of the door because her father was in the garage. Jenna told the TBI agents that, at first, she thought that the screaming that she heard was her parents fighting. She admitted that her father had recently lost the family's truck, but she did not know how or why.

Jeremy Ethridge testified that, on November 15, 2002, he was working as a 9-1-1 dispatch

operator when he received a call from Danielle DeBerry at around 2:00 a.m. Danielle told the operator that someone that her parents knew had entered the home, and Ethridge could hear a lot of screaming in the background.

Brian Robinson, who was a deputy for the Humphreys County Sheriff's Department at the time of this incident, testified that, on November 15, 2002, at around 2:06 a.m., he heard a call that there was an altercation in New Johnsonville. The caller said that her father and another man were fighting, and the caller mentioned blood. The deputy said that he went to the caller's address, and, when he arrived, he saw two young girls in the living room, one of whom was on the phone. Deputy Robinson said that the girls pointed to the garage, where he found Mr. DeBerry on the floor and Mrs. DeBerry kneeled over him in "hysterics." He also saw a spear gun lying on the floor, and he did not see any knives. He said that he did not see Mrs. DeBerry leave the garage until Mr. DeBerry was loaded into the ambulance. On cross-examination, the deputy said that when he arrived the DeBerrys's car was in the driveway, but he did not recall whether another car was also in the driveway.

Joseph Duncan, who was an officer with the New Johnsonville Police Department at the time of this incident, testified that, when he entered the house through the side door located near the driveway, he noticed that a pool of blood was at the threshold of the door, and he saw that the room was filled with boxes. Officer Duncan saw Mr. DeBerry lying on the floor and Mrs. DeBerry on her knees bending over him, holding a t-shirt or towel covered in blood on Mr. DeBerry's abdomen, and saying, "Breathe, Danny." The officer saw a spear gun in the garage near Mr. DeBerry. When the EMTs arrived, Officer Duncan and another officer had to physically remove Mrs. DeBerry from her husband so that he could be treated, and he described her as "hysterical." The officer asked Mrs. DeBerry if she was injured, and she said that she was not sure, but she thought that she had been stabbed. Officer Duncan then noticed some wounds on Mrs. DeBerry. On cross-examination, the officer said that Mrs. DeBerry was not inside the utility room when he found her.

Brian Baker, an officer with the Humphreys County Sheriff's Department, testified that, when he entered the DeBerry home, he saw Danielle from the living room, and, as he went into the garage, he saw Jenna in the utility room. He went into the garage and saw Mr. DeBerry on the floor and Mrs. DeBerry kneeling down beside him, "very hysterical." He said that he and another officer removed Mrs. DeBerry when the EMTs arrived, and they sat her on some boxes near the door. Officer Baker noticed that Mrs. DeBerry was also wounded, and she had one wound to her neck and one to her abdomen. The officer saw a spear gun at the scene but no knives.

Kevin Duke, who was a volunteer with the New Johnsonville Fire Department at the time of this incident, said that he was called to this scene as a "first responder" trained to stabilize the patient until the paramedics or EMTs arrive. When he went into the garage, he saw Mr. DeBerry on the floor and Mrs. DeBerry kneeling next to him. He described Mrs. DeBerry as in "hysterics," and he asked the police officers to remove her so that he could work on Mr. DeBerry. The officer described Mr. DeBerry's physical condition, saying that he had labored breathing and only a faint pulse. Mr. DeBerry had a large gaping wound to his neck and four to five stab or puncture wounds

to his abdomen, as well as numerous cuts along his arms. On cross-examination, Duke testified that, since this crime, he has assisted the Defendant with reading and spelling. He said that the Defendant needs assistance in these areas.

Two EMTs, Jan Cramer and Travis Monsue, responded to the crime scene. Cramer said that, as soon as they entered the doorway, they slipped in large amounts of blood on the floor. Cramer testified that they immediately went to Mr. DeBerry, and she thought that he was dead, but they carried him to the ambulance and performed CPR on him until they reached the hospital. She said that Mrs. DeBerry was screaming "help him, help him." Monsue saw Mr. DeBerry lying on the floor, and Mrs. DeBerry was hysterically screaming at them to help him. He said that he stepped on the spear gun as he was trying to get to Mr. DeBerry. Monsue said that they grabbed Mr. DeBerry, carried him to a cot, and placed him into the ambulance, but he assumed that Mr. DeBerry was not breathing. On cross-examination, Monsue said that Mr. DeBerry was not lying on the spear gun when he arrived and that he gave his boots to the TBI for testing. Cramer said on cross-examination that she did not notice a pink sweater or fleece near Mr. DeBerry, and she also gave her boots to the TBI the following morning to be tested for boot prints.

Lawrence Richard Jackson, Jr., M.D., testified that he was in the emergency room on the night that Mr. DeBerry was brought to the hospital, and Mr. DeBerry was dead when he arrived at the hospital because he had bled to death as a result of multiple stab wounds. Dr. Jackson was present when Mrs. DeBerry arrived at the hospital, and she was sent by helicopter to Vanderbilt for treatment because her injuries were greater than they could care for in their hospital.

Cheryl Moran and Douglas T. Spann, both EMTs, also responded to this incident to assist Mrs. DeBerry, after the first EMTs that responded realized that there were two patients, the second being Mrs. DeBerry. When Moran arrived, she assessed Mrs. DeBerry and determined that she had a three inch, very severe laceration to her neck and two abdominal wounds. She said that Mrs. DeBerry's neck wounds were bleeding profusely, and Mrs. DeBerry was "hysterical" and kept screaming, "If he's dead, let me die." Spann said that Mrs. DeBerry had a stab wound to the neck and to the side of the chest. He attempted to control the bleeding and took her to the ambulance. Spann described Mrs. DeBerry as "hysterical," and Mrs. DeBerry was saying that she did not want to live if her husband had died. Spann said that Mrs. DeBerry said that she was stabbed by a man named Will and that she and her husband had met Will in a bar earlier that evening. On cross-examination, Moran said that Mrs. DeBerry told her "he was coming though the door and he stabbed me on . . . his way out." She said that, while Mrs. DeBerry's wound did not look superficial to her, she would not argue if Vanderbilt had said that it was, in fact, superficial. On cross-examination, Spann said that Mrs. DeBerry told him that Will and her husband had gotten into an argument, but they had made up later that evening, and Will had bought her husband a beer. Mrs. DeBerry told him that "a spear gun was hanging on the wall" and said she was "stabbed as he left." She did not tell him that she was stabbed with the spear gun. He also said that Mrs. DeBerry did not say that Will had stabbed her husband.

Laura Jane Hodge, a special agent forensic scientist for the TBI, testified that she was called

to this crime scene, and she arrived at 10:55 a.m. She said that she took photographs and a video recording of the crime scene, and she described and identified multiple pictures for the jury. Agent Hodge said that she did not find blood in either the master bedroom or the daughters' bedroom, but she did see shoe prints of blood in the kitchen as well as in some other areas of the house. The agent also noticed that one of the steak knives was missing from a block of knives in the kitchen, but there was no track of blood between where the DeBerrys were found and the knives. Agent Hodge found blonde hair that appeared to have been cut and not pulled, and the parties stipulated that the hair belonged to Mrs. DeBerry. The agent saw shoe prints in blood, which she photographed. She also collected the spear gun, a piece of a shirt, and a doorknob for further examination. Agent Hodge testified that she took pictures of the treads of the boots of all of the EMTs and officers that were present at the crime scene. She said that she then eliminated the pictures of the shoe prints in blood that matched those boot prints. She could not eliminate eight of the prints that she found in the blood at the crime scene. The agent later determined that these were one of the daughter's footprints. On cross-examination, the agent testified that she did not examine Mr. DeBerry's boots, and she was not requested to do so by the State. She said that she did not perform Luminol testing on the rest of the house, including the sinks, to see if any knives or utensils had been washed of blood.

Hoyt Eugene Phillips, an agent with the TBI, testified, as an expert in the field of latent fingerprints, that he collected fingerprint evidence in this case. He said that he attempted to gather latent fingerprints from the blood on the door frame, the door knob, the spear gun, a cardboard box, and multiple other items. He said that he was unable to gather any identifiable prints from any of these items. On cross-examination, the agent said that he did not attempt to gather any fingerprint evidence from the Mr. DeBerry's body, and he conceded that this was technologically possible.

Joe Minor, an agent with the TBI, testified, as an expert in the field of forensic serology, which includes DNA analysis, that he videotaped the crime scene, which was played for the jury. Agent Minor noticed multiple boxes, and, on one of the boxes, he saw blood spatter that looked like it was caused by blood spurting from a major arterial wound. Agent Minor also saw a spear gun lying in a pool of blood and, near it, a piece of a blue checkered shirt sleeve. The agent saw that two knives were missing from two separate knife blocks in the kitchen, which he did not find unusual, and he looked inside and outside the house for a knife or knives as other possible weapons. The agent performed DNA testing, and he found only Mr. DeBerry's blood on the spear gun, the blue checkered shirt sleeve, a watch, and the door knob. Agent Minor found only Mrs. DeBerry's blood on her turtleneck, but he found Mr. DeBerry's blood on the back of her jeans. The agent tested scrapings from underneath Mr. DeBerry's fingernails, and he found only Mr. DeBerry's DNA.

On cross-examination, the agent said that he did not remember being told that one theory the police had was that Mrs. DeBerry stabbed Mr. DeBerry while Mr. DeBerry was holding her around her neck from behind. He conceded that, if this theory were true, there would likely be Mr. DeBerry's blood on the back of Mrs. DeBerry's turtleneck. He said that he did not test the back of her turtleneck because he was not requested to do so. Agent Minor conceded that he tested only a small square of the checkered shirt, and he said that someone else's blood could be on another area of the shirt. The agent said that he did not find it unusual that there were two knives missing from

the knife blocks in the kitchen. Agent Minor testified that the TBI conducted a "cursory" search for knives in the house, but they did not look under the beds, in the crawlspace, or in the attic. The agent said that he did not check the sink traps for blood, and the agent did not recall which towels he tested for blood. He admitted that he did not check the bathtubs or the showers or the dishtowels in the kitchen area. The agent did not test the blood on the cardboard box to see if it was Mrs. DeBerry's blood, but agreed that, if it was her blood, it would have been inconsistent with her story of the events. The agent did not remember, until he saw the videotape, that there were bare footprints in blood at the crime scene. He said that, if he had been aware of these footprints, he would have told Agent Phillips about this, and Agent Phillips would have collected samples. The agent said that he did not check Mr. DeBerry's body to determine whose blood was present on him. On redirect examination, the agent testified that, if there were blood on the back of Mrs. DeBerry's shirt it could have been transferred by her leaning against one of the bloody boxes.

Bruce Phillip Levy, M.D., testified that he is the chief medical examiner in Nashville, and he performed Mr. DeBerry's autopsy. He said that Mr. DeBerry had four stab wounds to the chest that injured his liver and right lung, and each of these four injuries would have been fatal. One of the stab wounds went through Mr. DeBerry's rib, which he said would take a lot of force. He had three stab wounds to his back, and two of those would likely have been fatal because they struck the right lung. The doctor also saw multiple wounds to Mr. DeBerry's head, torso, arms, and legs. Mr. DeBerry's body also had multiple blunt force injuries to the head, body, arms, and legs. There was some evidence that the knife or the victim moved while being stabbed. Some of the wounds could have been created with such force that the hilt of the knife left a bruise on Mr. DeBerry's skin. The victim also had multiple defensive wounds to his hands. The doctor opined that Mr. DeBerry died as a result of multiple sharp force injuries, and his death was caused by another person. The doctor also opined that it was not possible that the spear gun caused any of the major injuries to Mr. DeBerry, and the injuries were caused by a knife that had only one sharp edge. Dr. Levy said that Mr. DeBerry's blood alcohol level was .118% at the time of his death, which is beyond the legal limit to operate a car. The doctor identified multiple photographs of the defensive wounds on Mr. DeBerry's hands and arms. He opined that Mr. DeBerry's wounds were caused by a single-edged knife that was three to four inches long by one inch wide. The doctor noted that Mr. DeBerry did not sustain any injuries to the inside of his hands, but there were injuries to the back of his hands. The doctor said that it was possible that Mr. DeBerry was holding the spear gun. He said that some of the wounds would have impeded Mr. DeBerry's ability to hold the spear gun because he would have been losing consciousness. Dr. Levy said that he determined from Mr. DeBerry's clothing that Mr. DeBerry was standing upright when he was bleeding.

Dr. Levy said Mrs. DeBerry's neck wounds were superficial, meaning that they did not penetrate beyond a certain depth, but they still required treatment. Dr. Levy compared Mr. DeBerry's wounds to Mrs. DeBerry's wounds, and he concluded that they were similar. Dr. Levy did not see any "hesitation" marks near Mrs. DeBerry's neck wounds, which he would expect if she had inflicted the wounds on herself. Dr. Levy examined pictures of Mrs. DeBerry's hands, and he saw what appeared to be defensive wounds on the front and back her hands. The doctor testified that he was affiliated with the Learning Channel, and he performed part of Mr. DeBerry's autopsy during

-13-

a show. He said that, during that program, he was trying to determine if some of Mr. DeBerry's wounds were created by a spear gun, and he could not rule out that the spear gun caused some of the wounds. Additionally, another speculation he had was whether these wounds went completely through Mr. DeBerry's body, however, the autopsy showed that this speculation was not accurate. The doctor said that, on the show, he also discussed theories of who may have committed this crime, and he discussed whether this may have been an altercation between husband and wife.

On cross-examination, Dr. Levy testified that he discussed on the show that perhaps this was a fight between Mr. and Mrs. DeBerry and that an unknown third party did not exist. The Defendant's Counsel then showed a videotape of the television show to the jury. In the videotape, the doctor discussed the possibility that Mr. DeBerry had his right arm around Mrs. DeBerry's neck during a physical altercation between the two. The doctor conceded that it was unusual in an altercation involving a knife to see defensive wounds only on the back of the hands, as was the case with Mr. DeBerry. Dr. Levy said that Mr. DeBerry was five feet and nine and one half inches tall, and he said that a woman could have made the wounds that he saw on Mr. DeBerry's body. Dr. Levy said that Mr. and Mrs. DeBerry's wounds were not consistent in number.

Jose J. Diaz, M.D., testified, as an expert in trauma surgery employed as a surgeon at Vanderbilt University Medical Center, and he treated Mrs. DeBerry on November 15, 2002, for several stab wounds. Dr. Diaz testified that Mrs. DeBerry had several minimal facial injuries and one laceration on the left side of her neck. He described Mrs. DeBerry as covered in blood and suffering from "marked" emotional distress. Upon further evaluation, it was clear to him that Mrs. DeBerry required operative intervention for her abdominal injuries because she was bleeding internally. Dr. Diaz performed surgery on Mrs. DeBerry and found a moderate amount of blood in her abdomen, and while her organs were largely without injury they required some direct suturing. He also repaired the defects inside and outside of the abdominal wall caused by stab wounds that were approximately two to three centimeters in length. He examined Mrs. DeBerry's neck wound, determined it was not critical, and repaired the wound. Dr. Diaz noted that pictures of Mr. DeBerry's stab wounds showed that they were two to three centimeters in width, which was the same width as Mrs. DeBerry's stab wounds.

On cross-examination, Dr. Diaz testified that Vanderbilt's medical records indicated that Mrs. DeBerry's neck wound was superficial and that she had a history of depression but stopped taking her medication two months prior to this incident. The records also indicated that Mrs. DeBerry reported that she was tearful, easily startled and believed she was guilty concerning her husband's death. On redirect examination, the doctor said that the knife penetrated three and a half to four inches into Mrs. DeBerry's abdomen. The doctor said that Mrs. DeBerry would have bled to death if her injuries to her abdominal cavity were left unattended.

Sandra Poltorak, an agent with the TBI, testified that she is a composite artist, and she went to Vanderbilt Hospital and interviewed Mrs. DeBerry to attempt to create a composite drawing of the man who committed the stabbing. Agent Poltorak said that she talked with Mrs. DeBerry while Danielle DeBerry was present at around 2:00 p.m. on November 18, 2002. The agent said that she

was initially concerned because Mrs. DeBerry was on some medication and was in pain when she interviewed her. Agent Poltorak met with Mrs. DeBerry a second time, on Nobember 25, 2002, because Mrs. DeBerry was in considerable pain and had taken painkillers during the first interview. Mrs. DeBerry provided information again and made some changes to the original composite picture. The agent agreed that Mrs. DeBerry was more comfortable with the second composite drawing than the first. The agent said that she was contacted by an agent who asked her to redraw the picture of a suspect by changing the suspect's hairstyle and adding facial hair to him. He told her that the difference between the subject and the composite drawing given by Mrs. DeBerry included hairstyle and facial hair. She said that she was given a picture of the subject, and she eliminated the beard, the moustache, and the stubble from the picture.

Kimberly Noles testified that she saw a news report on television about a suspect, who stabbed another man, and the report described how the suspect played pool and that he was a drifter with a big belly, and then the news report showed a composite sketch of the suspect. Noles testified that she called the TBI and told the person with whom she spoke that she recognized the verbal description of the suspect and the sketch "kind of sort of" looked like him. She identified a photograph of the Defendant, who she knew as "Thomas." Noles met the Defendant at the end of August 2002 when he assisted her after her car broke down outside of Oklahoma City. She drove the Defendant's "bluish-purple" Geo to Amarillo, Texas, and began an intimate romantic relationship with the Defendant, who indicated that he was single. The Defendant bought her a van, which she drove back to Tennessee while he followed her in his blue Geo. When they got back to Tennessee, the Defendant stayed with her for about a week, and, during that time, he told her that his occupation was to clean up chemical oil spills. Noles remembered seeing the Defendant's driver's license, which showed that he was in his mid-thirties, but she did not remember the last name on the license. She testified that after the Defendant stayed with her intermittently, he asked her to come and get him in Seattle, Washington, but she refused. Thereafter, the Defendant came back to stay with her, and they continued their romantic relationship during which she saw him shoot pool using only one hand. Noles recalled that the Defendant would change his hair color and length and he spoke English and Spanish. One night in late October or early November, the Defendant said he wanted to go to a nearby bar, but Noles was tired and refused so the Defendant left.

On cross-examination, Noles agreed that the Defendant looked healthier in court than he had in 2002. She said that he told her he was from Maine, and he traveled to clean up chemical spills. Noles recalled that the Defendant did not smoke, but he did cough a lot. Noles recalled that the Defendant got mad at her before he left because he did not want her using drugs, and she told him that, if she wanted to, she could smoke a joint. She also remembered that he was good enough at pool to hustle people.

Amanda Collum testified that her mother is a truck driver, and in 2002 she traveled with her mother. On November 17, 2002, they stopped at a Petro truckstop in Fort Smith, Arkansas, where she met the Defendant, who said his name was "Will Qverbey." Collum said that the Defendant looked different in court because when she met him he had no hair and a goatee. Collum said that, when she met the Defendant, he was wearing jeans, a checkered flannel shirt, a baseball cap, and

white tennis shoes. Collum recalled that the restaurant at the truck stop was full, and the Defendant asked if he could come and sit with her and her mother. They agreed, and the Defendant ate with them and told them that he was driving a diesel truck. She remembered that the Defendant received "quite a few phone calls" on his cell phone. Collum also testified that the Defendant told her that he was thirty-two, and she did not believe him so he showed her his driver's license. She remembered that the Defendant spoke both English and Spanish, and he told her that he also spoke French and Italian. Further, he said that he had houses in Mexico, Maine, and Canada and that he was not married. She said that, after she left the truckstop, the Defendant called her numerous times each day for a couple of weeks.

Karen Rose testified that she is employed by Auto Zone Limited, which is a business that sells older used vehicles in Seattle, Washington. On December 13, 2002, a man purporting to be "William Qverbey" came in driving a 1997 Geo that he wanted to trade for another car with fewer miles. He said that he liked to travel and that he needed to get back to Colorado because that is where he worked, and he did not want to take a chance driving the Geo because it had 197,000 miles on it already. She also remembered that, while there was some trash inside the car, the car was clean inside. Rose found it unusual that the car was clean because most cars that came into her business required professional cleaning. Rose testified that her business traded Qverbey a red 1993 Escort for the blue Geo as a straight deal, meaning no money was exchanged. Rose described Qverbey as "kind of a big guy, dark hair, very loud . . . You just got the sense that he wasn't leaving until he got what he wanted."

Rose recalled that Qverbey had a title to the Geo that was in the name of and signed by Thomas Pearson, and Qverbey said that Pearson was his uncle. Although the title was in Pearson's name, Auto Zone Limited was able to make the trade because the title was already signed. As part of the trade, she copied his driver's license. Rose identified the Defendant's driver's license, which listed his name as William Qverbey, as being the same driver's license that Qverbey showed her the day that he traded his car. She did not, however, recognize the Defendant in court as the man who purported to be Qverbey, and she said that she did not see Qverbey in the courtroom.

Rose explained that in a cash deal such as this her business would transfer the title, and then send the title directly to the person who purchased the vehicle. Rose recalled that, in February of 2003, Qverbey called her, and she recognized his voice. She said that he told her that he needed his registration, and she told him that the registration was sent to his Belen, New Mexico address, which was the address listed on his license. Qverbey told Rose that he was working in Colorado and that he never got the title, but his tags were going to expire so he needed some proof of ownership. He asked Rose to send a new registration to him in Colorado, which Rose did. She recalled that she sent the registration to 4611 Kipling Street, Apartment #15, Wheat Ridge, Colorado. Rose said that Qverbey called her again in June of 2003 and said that he was defending himself in a legal action involving his Geo, and he needed pictures of his Geo to show that it had been vandalized. Rose informed Qverbey that the Geo was sold, but she would make an effort to get some photographs of the car. When Rose could not find the phone number of the buyer she did not pursue the matter further because it did not seem to be of great importance.

The parties stipulated that:

[T]he Chevrolet Geo Metro automobile, greenish-blue in color, previously in the possession of the Defendant, Albert Saavedra, and registered under the name of Thomas Daniel Pearson, was seized by the Pierce County Sheriff's Department, acting in conjunction with the Lakewood Police Department, within the state of Washington; that the seizure of the vehicle occurred on April 8, 2004; that at the request of [Special Agent] Derrick Jones with the Tennessee Bureau of Investigation, the vehicle was processed by the Pierce County Sheriff's Department, in an effort to determine if there was present within said vehicle anything of evidentiary value in the matter of the State of Tennessee versus Albert Saavedra; that no such evidence was found on this date within the Chevrolet Geo Metro automobile.

William G. Brady, III, testified that he was an agent with the Colorado Bureau of Investigations ("CBI"), and, in January of 2003, the TBI contacted him, informed him of the homicide investigation, and requested that he investigate some phone calls that were made from the Defendant's cell phone to phone numbers in Colorado. The agent found that one of the phone numbers called by the Defendant's cell phone was listed to a woman named Tedjosunarto. The agent said that Tedjosunarto's address was listed as 4611 Kipling Street, Wheat Ridge, Colorado. Agent Brady contacted the apartment manager to ensure that Tedjosunarto lived in the apartment and showed the manager the Defendant's picture. The manager identified the Defendant's picture as belonging to a man named Thomas D. Pearson and said that Pearson lived in apartment number fifteen with Tedjosunarto. The agent then obtained the rental application for Sianawati Tedjosunarto and Thomas Daniel Pearson, after which he received two warrants for Thomas Daniel Pearson from the State of Tennessee. The agent went to the apartment with Agent Lawrence Gavell to interview Tedjosunarto about the phone calls that had been traced to her phone from the Defendant's phone and about her relationship with the Defendant. When he arrived at the apartment, he asked Tedjosunarto if he could speak with her about her relationship with Pearson, and Tedjosunarto said that she was late for work and did not want to conduct the interview. The agent said that Tedjosunarto's body language indicated to him that the Defendant may be in the apartment, and he asked Tedjosunarto if the Defendant was in the apartment. Tedjosunarto immediately dropped her head, which indicated to the agent that the Defendant may be in the apartment. The agent entered the apartment and found the Defendant wearing shorts and a t-shirt hiding in the bathroom with the lights turned off. Agent Brady said that the Defendant was in the bathtub with the shower curtain closed, but there was no water running, and the bathtub was not wet.

Agent Brady testified that he restrained and interviewed the Defendant, and he determined that the Defendant was the man depicted in the photograph sent to him by the TBI. Further, the TBI described tattoos that the Defendant may have, and the agent saw those tattoos on the Defendant. Agent Brady called the Defendant by the name Thomas Pearson, the name listed on the apartment rental agreement, and the Defendant told him that his name was William Qverbey. The Defendant then presented an identification card from the State of New Mexico that showed his photograph and listed the name William Qverbey and a New Mexico address. The agent also obtained a New

Mexico driver's license that showed the Defendant's picture, the name William Qverbey, and listed the same New Mexico address. The agent noted that both of these documents were issued on the same day. The agent recovered several documents from the Defendant's apartment, one of which was a "defaced" Social Security card under the name William Verbey. The defacement appeared in the area in front of the "V" in the body of the document and also in front of the "V" on the signature line of the document. The agent also retrieved a certified copy of an original birth certificate from North Carolina that showed the name William Verbey and noted that it appeared that the "V" had been defaced on this document as well.

The agent said that, after verifying the Defendant's identity, he placed the Defendant under arrest and gave the Defendant Miranda warnings. Agent Brady asked the Defendant if he owned a vehicle, and the Defendant told him that he owned a red Ford Escort parked outside the apartment and that his cell phone was located in the Escort. Agent Brady asked the Defendant if he owned a blue Geo car, and the Defendant said he did not. The Defendant then gave Agent Brady and Agent Gavell verbal consent to search the Escort. The agent found the Defendant's cell phone, which the TBI had told the agent had been used to make several calls to Colorado phone numbers.

Agent Brady said that he and Agent Gavell took the Defendant to the Jefferson County Jail to be booked, and, right before booking, the Defendant said that his real name was Albert Saavedra. The agent said that, at that time, the Defendant also told him that he was in "big trouble" and that "[i]t [would] be a long time before [he] g[o]t to see [his] kid." Further, he said that "if [the agent] would have let [him] hug [his] kid, [he] would have told [the agent] everything."

On cross-examination, the agent conceded that the date that both of the New Mexico identifications were issued was September 24, 2002, which was two months before the alleged crimes in Tennessee. Agent Brady was aware that the Defendant may have used the name William while in Tennessee, and the Defendant could have disposed of the identification cards that showed his name as William. The agent said that the Defendant traded in a blue Geo and purchased the Ford Escort using the name William Qverbey. The agent said that, in addition to the fugitive warrant from Tennessee, the Defendant had a misdemeanor warrant for failure to appear on a reckless driving ticket in Colorado. The warrant for the failure to appear was listed under the name Thomas Daniel Pearson.

Lawrence Gavell testified that, in January of 2003, he was working as an agent for the CBI when he assisted Agent Brady in this Tennessee homicide investigation. Agent Brady told him that the TBI had obtained phone records from the Defendant's phone that indicated that the Defendant was making a number of calls to a Colorado address and asked Agent Gavell to go with him to interview a woman who was living at the Colorado address. Agent Gavell understood that there were two warrants for the Defendant's arrest, one for first degree murder and one for attempted first degree murder. Agent Gavell recalled that, when they arrived at the apartment, Tedjosunarto answered the door, and the agents identified themselves as agents with the CBI by showing their badges and agent identifications. Agent Brady attempted to interview Tedjosunarto, but Tedjosunarto said that she was late for work and declined to be interviewed. Agent Gavell said that

they asked Tedjosunarto if the Defendant was at the apartment, and Tedjosunarto said that he was not and gave them permission to search the apartment. The agents found the Defendant in the bathroom shower wearing grey shorts and a grey t-shirt, and they handcuffed him and gave him <u>Miranda</u> warnings. The Defendant said that his name was William Qverbey and that his identification was on the kitchen table in his wallet.

The agent recalled that the Defendant said he had a red Ford Escort that was parked in the parking lot of the apartment complex. The agent asked if the Defendant had a cell phone, and the Defendant said he did have a cell phone, but it was inactive and located in his car. At some point, when Agent Gavell was alone with the Defendant, the Defendant told the agent that the blue car that he owned was in Albuquerque, New Mexico. Later, when the agent was transporting the Defendant to jail, the Defendant recanted and said that this was a lie. The Defendant also told the agent that he had another car parked in Denver, but the agent went to the address the Defendant provided and could not find the car that the Defendant described. On cross-examination, the agent said that the other car that he was never able to locate was not a blue Geo. He said that the Defendant told him that he owned more than one car and that he owned the red Ford Escort parked in the apartment parking lot. Agent Brady found the purchase agreement for the car and the Defendant's cell phone inside the car.

Diane Freas, a fugitive specialist with the Jefferson County Sheriff's Office in Golden, Colorado, testified that she was given paperwork to process "Mr. Pearson" for extradition and was told that "Mr. Pearson" was upset about being called by that name because it was not his name. Freas said that, upon receiving that information, she spoke with the Defendant, he advised her that his name was not Thomas Pearson but was Albert Saavedra, and he offered her his mother's phone number for verification. Upon her questioning, the Defendant said that the last time he was in Tennessee was when the stabbings in this case occurred. Freas told the Defendant that she worked for a law enforcement agency and was not his attorney, and he would have access to a public defender. The Defendant then told her about the circumstances surrounding this killing. He told her that he had been out the night of the killing, and he bought a round of beers for several people and later left the bar with a man and a woman and went to their house. When they got to the house, the man made some comment to him about the Defendant liking the woman and wanting to be with her, and he told the man that he did not want any problems and just wanted to leave, and the man left and came back with "something that you shoot -- that you pull back and shoot -- the long thing that you pull back and shoot and that they began to wrestle." At this point, Freas again advised the Defendant that he should not be speaking with her, and he agreed to waive extradition because he said that "he wanted to go back and just get it all taken care of." The following day, the Defendant decided not to waive extradition, and Freas told the Defendant that he was innocent until proven guilty, and the Defendant responded "oh, no. I did it." At that point, Freas stopped the Defendant by stating that he should not tell her that information. On cross-examination, Freas said that she did not know whether the Defendant told the CBI agents the same story that he told her.

Mike Felsoci testified that, in January of 2003, he was an officer with the Jefferson County Sheriff's Office in Colorado assigned to the homicide unit. He said that his sergeant informed him

that Diane Freas contacted the sheriff's department to tell them that a man named "Thomas Pearson," who was in the jail, may want to speak with them. Officer Felsoci, assisted by Investigator Dan Dunnebecke, interviewed the Defendant for almost three hours, and he created a videotape, a redacted version of which was played for the jury. The officer described the Defendant's demeanor when the officer walked into the interview room as "[f]ine," but later the Defendant seemed "a little nervous" and "[s]ometimes . . . a little emotional . . . [but] [n]ever angry." During the interview, Officer Felsoci asked the Defendant to draw a picture of a spear gun that the Defendant said that Mr. DeBerry pointed at him and the room where the murder occurred, and those pictures were shown to the jury. The Defendant indicated that the struggle occurred in the middle of the garage. The officer recalled that the Defendant said that he was at "the TA" and later clarified that he meant a truckstop. Early in the interview, the Defendant said that his wife gave him money, but later he said that his wife did not give him money. The officer also understood the Defendant to say that he went to a bar on the evening of this incident with someone named "Red" and only started buying drinks for everyone after he had been at the bar for a while. The Defendant said that he was injured in this incident, but the only injury the officer noticed was a small, healing cut on the Defendant's left index finger. The officer thought it was clear from the Defendant's statement that the Defendant only went into the garage and not into any other part of the house.

Officer Felsoci said that the Defendant told him that the Deberrys' two daughters were present at the house when the Defendant was there. The Defendant told him that the Defendant could not recall "little things" and indicated that he had suffered from seizures in the past, the last of which was "a couple of months ago." Further, he said that he had been taking 300 milligrams of Dilantin for the seizures, but the last time he had taken his medication was approximately one month before the interview. Officer Felsoci also recalled that the Defendant mentioned that he had previously suffered a stroke.

Officer Felsoci described how the Defendant used his hands when he spoke and said that the Defendant told him at first that, on the night of this incident, Mrs. DeBerry called her husband's name. He then said that Mrs. DeBerry said, "Will, stop," and finally changed his story again to say that Mrs. DeBerry called to her husband. The officer said that the Defendant demonstrated how, at one point during the struggle between him and Mr. DeBerry, Mr. DeBerry's back was pressed against the Defendant's chest. The Defendant also said that the shirt he was wearing that night had blood on it, and he disposed of the shirt in a shower at a TA truckstop.

On cross-examination, the Officer Felsocisaid they interviewed the Defendant for an extensive period of time and went over the same subject matter to help him remember what occurred. Officer Felsoci agreed that he was unaware that Mr. DeBerry had been diagnosed with manic depression but was not taking his medication. The officer said that the Defendant acted as if he did not know that the victim had died, and his partner said to the Defendant "well . . . maybe something happened after you left?" The officer agreed that it is possible that something had happened to Mr. DeBerry after the Defendant left.

Investigator Daniel Dunnebecke, an investigator with the Jefferson County Sheriff's Office

in Golden, Colorado, testified that he interviewed the Defendant with his partner, Officer Felsoci. Investigator Dunnebecke described the interview room as being six feet by eight feet and said that he sat between two and five feet from the Defendant. The investigator recalled that the Defendant became emotional at one point in the interview, but he noticed that there was never any moisture coming from the Defendant's eyes. The investigator remembered that the Defendant said that, when he left Humphreys County, he picked up a hitchhiker at a TA truckstop who drove him from Tennessee to Denver, Colorado, which would be a sixteen to eighteen hour drive. Investigator Dunnebecke testified that the Defendant said during the interview that he suffered a cut to his finger during his struggle with Mr. DeBerry. The investigator saw the cut and described it as being approximately one quarter to one half inch in length and said it was healed over. Investigator Dunnebecke said that, the day after he interviewed the Defendant, he attempted to take a photograph of the Defendant's cut, but the Defendant refused this request.

On cross-examination, the Investigator Dunnebecke testified that, when Officer Felsoci asked the Defendant where he got the cut on his finger, the Defendant responded, "I don't know, to be honest." The Defendant showed him a scar on the Defendant's right wrist. The investigator identified the right shirt sleeve of the Defendant's shirt, which was found at the crime scene, and he said that the rips or cuts in the shirt could be consistent with a wound to the right wrist of the person wearing the shirt.

J.C. Damesworth testified that he is the chief deputy in Humphreys County, and he assisted in this investigation by searching for the murder weapon at the DeBerrys' house and by preparing and showing multiple photographic line-ups to witnesses. As part of this investigation, Chief Deputy Damesworth received information that, on the night of the murder, the Defendant started his evening at a TA Truckstop. The chief deputy determined that the two closest TA Truckstops are on I-40, the first close to Jackson, Tennessee, and the second close to Nashville, Tennessee. He said that the TA Truckstop near Nashville was approximately 70 miles from New Johnsonville, where the crime occurred, and the TA Truckstop near Jackson was approximately fifty miles from New Johnsonville. On cross-examination, the chief deputy testified that the closest truck stop to New Johnsonville was a Pilot. He said that he never searched Mrs. DeBerry's Volvo, and he did not search for the murder weapon in a fenced-in area in the DeBerrys' backyard where a dog was kept. Chief Deputy Damesworth also did not search the trash area that was located on the grounds, and he did not search the residences or cars of Rhonda Miller, Craig Upchurch or Greta Flowers. He agreed that he did not try to ascertain whether any of those three people owned a dark colored, maroon colored, red, or brown vehicle.

Charles Hammond testified that he resided at the Humphreys County Jail and began serving his sentence on March 1, 2004, for violating his probation for sentences from theft offenses that occurred twelve years ago. Hammond testified that the Defendant told him that he met a girl in a bar, and she performed oral sex on him, after which a guy came in and grabbed the woman by the hair and started beating her. Hammond said that the Defendant told him that he grabbed a paring knife and stabbed the guy several times but that he did not know how many times until he read it in the newspaper. The Defendant said that he stabbed the woman because he wanted her to testify that

-21-

she killed the man in self-defense, but she did not do what they had discussed and double-crossed him. The Defendant told him that the man was not moving when the Defendant left the house. On cross-examination, Hammond said that his previous theft convictions were felonies, and he denied that he was testifying because he had a hearing on his violation of probation charge that was scheduled soon. Hammond agreed that the Defendant's counsel had previously asked him if he had made statements about trying to kill someone and rip their throat out, and denied that he made these statements. Then, when a tape of him making such statements was played, he admitted that he had said those things and admitted lying under oath when first asked about these statements. Hammond denied that his testimony was based upon conversations that he overheard between the Defendant and the Defendant's attorney.

Ronnie E. Toungette, the Sheriff for Humphreys County testified that part of his job was being the chief jailer. He said that the Defendant was brought to the jail in March of 2003 and had been located there for a little over one year, and he confirmed that Hammond's cell was close to the Defendant's cell. He said that, according to procedure, when an inmate's attorney comes to visit, they take the inmate and the attorney to an interview room, where they can observe them through a window. He said that, although this was currently the procedure, on February 26, 2004, when the Sheriff was unable to be at the jail, the Defendant's attorney went back to visit the Defendant through the bars of his jail cell. He said that the jail records indicated that the Defendant's counsel entered the cell area around 1:45 p.m. and left around 4:00 p.m. The Sheriff said that it was not unusual for attorneys to visit clients in their cells, but he did not like that practice.

The sheriff testified that Hammond was brought to the Humphreys County jail on March 1, 2004, and Hammond was being held in Mississippi prior to that. Sheriff Toungette said that he heard the Defendant's counsel cross-examining Hammond, during which he heard Hammond deny that his testimony was based upon conversations that he overheard between the Defendant and the Defendant's counsel. The sheriff said that he searched his journal entries and was unable to find any time, other than February 26, 2004, when the Defendant's counsel visited the Defendant at his jail cell. Sheriff Toungette recalled that Hammond told him that he wanted to talk with someone on March 16, 2004, and Agent Jones happened to be in the jail, so the sheriff called Agent Jones to come and speak with Hammond.

On cross-examination, the sheriff said that, if the Defendant's counsel said that they had been to see the Defendant at his cell more times than indicated by the record, he would assume that the jailer failed to make a note regarding the visit because he did not think that either of the Defendant's counsel would lie. Sheriff Toungette agreed that it was also an important requirement that the jailers make a notation of items given to an inmate. He said he did not know whether his records indicated that the Defendant's counsel brought him cheeseburgers or a light fixture. Further, he agreed that it was possible that the Defendant's counsel visited the Defendant and a record of the visit was not made in the books.

Gary E. Dill testified on the Defendant's behalf that he was in Tennessee on November 14, 2002, and witnessed an altercation at a drinking establishment between a blonde-haired woman, who

was about five feet and six or seven inches tall, and a man, who wore a pair of blue jeans and a black sweater. He said that the woman was wearing white tennis shoes, a pair of stonewashed jeans, and a white long-sleeved shirt with something on the front of the shirt. He said that the woman came into the bar, went straight towards the bathroom, and, when the man walked out of the bathroom, she hit him. The man grabbed the woman's hands, and they got into an argument. Dill recalled that "no sooner than [the argument] started, it was pretty much over. And, then, [they] went back to having a good time." Dill estimated that the woman struck the man twice and shoved him away from her. Dill agreed that he has since learned that the man was Mr. DeBerry. He also said that he saw the Defendant there that evening and that the Defendant was "real friendly with everybody. . . . There were no problems." He said that, when they got ready to leave, the Defendant calmed Mr. DeBerry down because Mr. DeBerry wanted to go to Jackson because they serve liquor by the drink, and he asked the Defendant to go with him. On cross-examination, Dill agreed that he did not know the Defendant's name, but the Defendant was buying drinks for everybody. Dill recalled that the Defendant came into the bar with Mr. DeBerry.

Lindsey Rennee Netterville testified that she lived directly across the street from the DeBerrys, and, on November 15, 2002, she woke up and there were ambulances and police officers outside her house. Netterville recalled that, at 1:30 a.m., she saw two cars at the DeBerrys' house. One of the cars was the DeBerrys' white Volvo and the other car was parked at an angle towards the back yard on the left side of the driveway. She recalled that the car parked at an angle was not a hatchback and had a trunk, and it had its headlights and taillights on. Netterville stated that there was no car parked on the right side of the DeBerrys' driveway.

Based upon this evidence, the jury found the Defendant guilty of voluntary manslaughter and attempted first degree murder. The Defendant filed a motion pursuant to Tennessee Rule of Criminal Procedure 33(f) to set aside the verdict. In its order ruling on the motion, the trial court noted that it had neglected to rule on the Defendant's motion for judgment of acquittal, pursuant to Tennessee Rule of Criminal Procedure 29(a), at the close of the State's proof and that this neglect was error. The trial court, therefore, belatedly ruled on the motion and granted the motion as to the charge of attempted first degree murder. The court entered a judgment of guilty to the lesser-included offense of attempted second degree murder, finding that the evidence presented supported that offense.

## II. Analysis

On appeal the Defendant contends that: (1) the evidence is insufficient to sustain his conviction for attempted second degree murder; (2) the trial court erred by not instructing the jury on aggravated assault as a lesser-included offense of attempted first degree murder; (3) the trial court erred when it took his motion for judgment of acquittal under advisement and when it denied this motion with respect to attempted second degree murder; and (4) the trial court erred when it denied his Rule 33(f) motion.

## A. Sufficiency of the Evidence

The Defendant first contends that the evidence is insufficient to sustain his conviction for attempted second degree murder. He first notes that attempted voluntary manslaughter is a lesser-included offense of attempted first degree murder and that the jury convicted him of the voluntary manslaughter of Mr. DeBerry, thereby finding that he acted under passion, in self defense or while committing an assault. Accordingly, the Defendant states that the evidence proves that this was still his state of mind when he attacked Mrs. DeBerry. Further, the Defendant asserts that had he wanted to kill Mrs. DeBerry he clearly could have done so. The Defendant concludes that there is insufficient proof to rule out that the Defendant had a chance for his passion to subside or that he interpreted Mrs. DeBerry's grabbing of the spear gun as a threat and, having no intent to kill her, just slashed wildly at anything in close proximity to his drunken brawl with Mr. DeBerry. The State counters that intent can seldom be proven by direct evidence and may be deduced or inferred from the character of the assault, the nature of the act, and from all the circumstances of the case and that the circumstances in this case support the conclusion that the Defendant knowingly attempted to kill Mrs. DeBerry.

When the sufficiency of the evidence is challenged, the standard of review is whether, considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004); State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Questions regarding the credibility of witnesses, the weight and value of the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. Id. When a defendant challenges the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Vaughn, 29 S.W.3d 33, 39 (Tenn. Crim. App. 1998). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. See State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1) (2003). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20) (2003). Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2) (2003). Therefore, criminal attempt requires two material elements: (1) the culpability required for the attempted crime; and (2) an act in furtherance of the attempted crime. Wyatt v. State, 24 S.W.3d 319, 323 (Tenn. 2000). Therefore, a defendant is guilty of attempted second degree murder if he knowingly attempted to kill another without adequate provocation and with the belief that his conduct would result in death without further conduct on his part. Whether

a defendant "knowingly" attempted to kill his victim is a question of fact for the jury. State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). "Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." Id. at 105.

In the case under submission, the evidence, viewed in the light most favorable to the State, proves that the Defendant went to a bar on the evening of November 14, 2002, where he met Mr. and Mrs. DeBerry. He drove Mr. DeBerry back to the DeBerry residence while Mrs. DeBerry followed them in her car. When they arrived at the house, Mrs. DeBerry went in to go to bed, and the Defendant and Mr. DeBerry stayed outside the house and in the garage. Shortly thereafter, a fight involving both a spear gun and a knife ensued, and the Defendant killed Mr. DeBerry in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. See Tenn. Code Ann. § 39-13-211 (2003). During the fight, Mr. DeBerry called to Mrs. DeBerry for help, and, hearing those cries, she came into the garage to find the Defendant and Mr. DeBerry wrestling with the spear gun. She stepped between the two men and grabbed the spear gun, and Mr. DeBerry fell backwards after letting go of the spear gun. The Defendant, who was much taller and bigger than Mrs. DeBerry, then jabbed and lunged at Mrs. DeBerry. The Defendant stabbed Mrs. DeBerry three times, twice in the abdomen and once in the neck. Mrs. DeBerry asked the Defendant why he was doing this and then her daughter, Danielle, who had heard the noise, opened the garage door. The Defendant told Danielle to shut the door, and then he fled, only returning to Tennessee when he was arrested in, and extradited by, Colorado. After he was in jail in Tennessee, the Defendant admitted to another inmate that he killed a man, stabbed the man's wife, and disposed of the weapon.

Based upon this evidence, and viewing it in the light most favorable to the State, a rational juror could have concluded from Mrs. DeBerry's multiple stab wounds, the Defendant's relative size, his subsequent flight from the scene, and his own statements, that he acted knowingly and intended to kill Mrs. DeBerry without the passion that would justify attempted manslaughter. The Defendant is not entitled to relief on this issue.

## B. Aggravated Assault Instruction

The Defendant next contends that the trial court erred by not instructing the jury on aggravated assault as a lesser-included offense of attempted murder. The State counters first that this issue is waived and second that aggravated assault is not a lesser-included offense of first degree murder. The trial court has a duty to instruct the jury on any lesser-included offenses of the charged offense when such instruction is supported by the evidence, regardless of whether the Defendant has requested such an instruction. State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999). The standard for an appellate court's review of the trial court's charge to the jury regarding lesser-included offenses is de novo with no presumption of correctness. State v. Moore, 77 S.W.3d 132, 134 (Tenn. 2002).

If an offense is found to be a lesser-included offense, the court must next ascertain whether

the evidence justifies a jury instruction on the lesser-included offense. Bowles, 52 S.W.3d at 75. To do so, the court must first determine whether there is evidence that "reasonable minds" could accept to establish the lesser-included offense. Burns, 6 S.W.3d at 469. The court must view the evidence liberally in a light most favorable to the existence of the lesser-included offense without judging its credibility. State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001); Burns, 6 S.W.3d at 469. Finally, the court must determine if the evidence is "legally sufficient" to support a conviction for the lesser-included offense. Burns, 6 S.W.3d at 469. The evidence, not the theories of the parties, determines whether an instruction on a lesser-included offense should be given. State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002). Furthermore, the decision to convict on a lesser-included offense should not be taken from the jury simply because the element distinguishing the greater offense from the lesser offense is "uncontroverted." Id. at 189. If the evidence justifies an instruction, the failure to charge the offense is error even though the evidence was also sufficient to support the greater offense. Burns, 6 S.W.3d at 472.

The State correctly points out that the Defendant has risked waiver by not requesting at trial a jury instruction about aggravated assault. See Tenn. Code Ann. § 40-18-110(c) (2003). Further, he also risks waiver by failing to provide adequate citation to authorities and appropriate references to the record. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10 (b). Our Supreme Court has recently held that "[t]he current version of [Tennessee Code Annotated] section 48-18-110(c) subjects the right to lesser-included offense instructions to the general rule that issues concerning incomplete instructions are deemed waived in the absence of an objection or special request." State v. Page, – S.W.3d –, 2006 WL 300980, at *5 (Tenn. 2006). Further, "While section 40-18-110(c) precludes a defendant who fails to request a lesser-included offense instruction in writing from seeking plenary appellate review of the issue, an appellate court is not precluded from sua sponte reviewing the lesser-included offense issue under the plain error doctrine. State v. Rice, – S.W.3d __, 2006 WL 397524, at *26 (Tenn. 2006) (citing Page, 2006 WL 300980, at *5).

In the case presently before us, the Defendant failed to request in writing an instruction on the offense of aggravated assault and is therefore precluded under section 40-18-110 from seeking plenary appellate review of the issue. We will look, however, to whether the trial court's failure to instruct on the lesser-included offense of aggravated assault was plain error.

When determining whether plain error review is appropriate, the following five factors must be established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused [must not have waived] the issue for tactical reasons; and
(e) consideration of the error [must be] "necessary to do substantial justice.

State v. Terry, 118 S.W.3d 355, 359 (Tenn. 2003). An error would have to be especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding to rise to the level of

plain error. <u>Page</u>, – S.W.3d at –, 2006 WL 300980, at *6.

We first consider whether a clear an unequivocal rule of law has been breached. The law is settled that aggravated assault is not a lesser-included offense of attempted first degree murder. <u>State v. Burns</u>, 6 S.W.3d 453, 466-67 (Tenn. 1999); <u>State v. Christopher Todd Brown</u>, No. M1999-00691-CCA-R3-CD, 2000 WL 262936, at *2 (Tenn. Crim. App., at Nashville, Mar. 9, 2000), *Tenn. R. App. P. 11 application denied* (Tenn. Sept. 10, 2001). In this case, however, the trial court found that the evidence presented at trial could not sustain the Defendant's conviction for attempted first degree murder, and it reduced that conviction to attempted second degree murder. We must, therefore, determine whether aggravated assault is a lesser included offense of attempted second degree murder.

In <u>State v. Rush</u>, 50 S.W.3d 424 (Tenn. 2001), the Tennessee Supreme Court held that reckless aggravated assault was not a lesser-included offense of attempted second degree murder under the <u>Burns</u> test. <u>Rush</u>, 50 S.W.3d at 429-30. The Court stated that "the offense of attempted second degree murder requires proof of the following elements: (1) a knowing (2) attempt, (3) to kill another. <u>See</u> Tenn. Code Ann. §§ 39-13-210(a)(1) (1999) (defining second degree murder); 39-12-101 (1999) (defining criminal attempt)." <u>Rush</u>, 50 S.W.3d at 430. The <u>Rush</u> court explained:

> [U]nder part (a) of the <u>Burns</u> test, reckless aggravated assault cannot be a lesser-included offense of second degree murder because reckless aggravated assault requires proof of either (a) serious bodily injury or (b) bodily injury and display of a deadly weapon, neither of which is required to prove attempted second degree murder.

<u>Id.</u> at 430. Furthermore, the Tennessee Supreme Court concluded that part (b) of the <u>Burns</u> test was not satisfied. The <u>Rush</u> court explained:

> [T]he harm contemplated by the bodily injury element of reckless aggravated assault is not less serious than the harm contemplated by the attempted killing element of attempted second degree murder because many attempted murders do not involve any injury at all to the victim, whereas a reckless aggravated assault always involves bodily injury.

<u>Id.</u> at 431. Likewise, this Court has held that neither aggravated assault nor assault is a lesser-included offense of attempted second degree murder under the <u>Burns</u> test. <u>State v. Bobby J. Hughes</u>, No. W1999-00360-CCA-R3-CD, 2001 WL 91736, at *14 (Tenn. Crim. App., at Jackson, Jan. 26, 2001), *no perm. app. filed.* In <u>Hughes</u>, this Court noted that, pursuant to the statutory elements analysis mandated in <u>Burns</u>, "descriptive language in a charging instrument *will not create* a lesser-included offense if the statutory elements of the greater offense do not include all of the elements of the lesser offense or otherwise indicate inclusion via parts (b) or (c) of <u>Burns</u>." <u>Id.</u> at *14; <u>see</u> <u>Brown</u>, 2000 WL 262936, at *2 (holding that assault and aggravated assault are not lesser included offenses of attempted first degree murder under the <u>Burns</u> analysis because the statutory elements

of assault and aggravated assault are not included in the statutory elements of attempted first degree murder); see also State v. Renne Efren Arellano, No. M2002-00380-CCA-R3-CD, 2003 WL 535927, *2 (Tenn. Crim. App., at Nashville, Feb. 26, 2003) (holding that plain error required reversal of the defendant's conviction upon his guilty plea to aggravated assault because the defendant was originally charged with attempted first degree murder, and, under Brown, 2000 WL 262936, aggravated assault is not a lesser included offense of attempted first degree murder), *rev'd on other grounds* State v. Yorecku, 133 S.W.3d 606, 610 (Tenn. 2004).

A person commits aggravated assault who "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and: (A) Causes serious bodily injury to another; or (B) Uses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102(a) (1997). Tennessee Code Annotated section 39-13-101(a) (1997) states that a person commits assault who: "(1) Intentionally, knowingly or recklessly causes bodily injury to another; (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." In light of Rush and Hughes, we conclude that aggravated assault is not a lesser-included offense of attempted second degree murder because it requires proof of (a) serious bodily injury or (b) use or display of a deadly weapon in connection with the assault, neither of which is required to prove attempted second degree murder, and the harm contemplated by the bodily injury element of aggravated assault is not less serious than the harm contemplated by the attempted killing element of attempted second degree murder. See Rush, 50 S.W.3d at 430-31; Hughes, 2001 WL 91736, at *14. Accordingly, we conclude that aggravated assault is not a lesser included offense of attempted second degree murder. Therefore, no clear and unequivocal rule of law has been breached, and the trial court's failure to instruct on aggravated assault is not plain error. The Defendant is not entitled to relief on this issue.

## C. Motion for Judgment of Acquittal

### 1. Taking Rule 29 Motion Under Advisement

The Defendant contends that the trial court erred with regard to the attempted first degree murder charge when it took his motion, filed pursuant to Tennessee Rule of Criminal Procedure 29, under advisement. The Defendant argues that, had the motion been decided at the end of the State's proof, the Defendant could have made the decision of whether to testify knowing that he did not face this Class A felony.[3] The State counters that Rule 29 was amended in 1988, and, in its current incarnation, it contemplates a trial court taking a motion for judgment of acquittal under advisement following the State's evidence. The State asserts that the Defendant waived this issue by not renewing his motion at the close of his case. Further, the State asserts that any error is harmless beyond a reasonable doubt.

---

[3]We note that the Defendant argues that he may have testified knowing that he did not face "a possible class A felony." The Defendant would have, however, still been facing the first degree murder charge for Mr. DeBerry's killing, but he asserts he was confident at trial that the jury would not convict him of a charge greater than manslaughter.

The record shows that, at the close of the State's proof, the Defendant orally moved for a judgment of acquittal, and the trial court stated:

> In this case, there were two (2) people who were present at the beginning of the incident or altercation . . . . One is the [D]efendant and the other is deceased.
>
> We have no indication of how this situation began.
>
> With regard to assuming premeditation based on . . . the subsequent acts, I think it's been pretty roundly condemned by our appellate courts. And not only that, in this case, it's particularly inappropriate, because other than disposing of some evidence and so forth, the [D]efendant, basically, continued to do what he had been doing before, changing aliases and moving around.
>
> The legal sufficiency of . . . premeditation in this is case extremely weak. And the Court will reserve ruling on this case, pending some research on this issue. Because . . . it's going to be a close call. I, very likely, may let the jury decide it and, then, if the . . . jury comes back with first degree murder, I may have to look back and see if I have to drop that down to second [degree murder].

The trial court never entered an order on the motion for judgment of acquittal. The Defendant did not again request a ruling on this motion, and he did not renew his motion at the close of trial.

After the trial, and at the hearing on the motion for new trial pursuant to Rule 33(f) of the Tennessee Rules of Criminal Procedure, the trial court stated:

> [T]he Motion for a judgment of acquittal made at the end of the State's proof was taken under advisement during the lunch hour. It was my intention to rule after lunch.
>
> I just simply forgot to rule.
>
> Faced with this situation . . . I can either abandon the ruling on the issue or I can rule on it at this time, late.
>
> So . . . the Court chooses to rule on the Motion at this time.
>
> The Court grants the Motion made at the close of the State's proof for judgment of acquittal as to attempted first degree murder. There is just simply not time to premeditate in that situation. . . . there is just no evidence in the Court, in the record, before this Court that would allow a verdict of attempt to commit first degree murder to stand.

The evidence is, however, sufficient to convict the Defendant of attempt to commit murder in the second degree. The conviction is now of the lesser offense of attempted second degree murder.

The trial court went on to state that, because it determined that the evidence was legally insufficient to support attempt to commit first degree murder, that conviction was no longer before the court on the Rule 33(f) motion for new trial. The trial court found that attempted second degree murder and voluntary manslaughter were the two convictions that were properly considered pursuant to the Rule 33(f) motion. It then ruled, as a thirteenth juror, that the motion for new trial should be denied.

Tennessee Rule of Criminal Procedure 29(a) provides:

The court on motion of a defendant . . . shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the [S]tate is not granted, the defendant may offer evidence without having reserved the right.

The Rule goes on to state that, if the motion is made at the close of all of the evidence, the trial court may reserve ruling on the motion, submit the case to the jury, and decide the motion either before or after the jury returns a verdict. There is, however, no authority in practice or procedure for the trial judge to take under advisement a motion for judgment of acquittal made at the close of the State's proof, and, when the trial court does so, it constitutes error. Mathis v. State, 590 S.W.2d 449, 453 (Tenn. 1979).[4] The Defendant, however, can waive this error under certain circumstances. Id. When the trial court "overrules, or does not act, upon a motion for acquittal made at the conclusion of the State's proof," the Defendant's counsel, if convinced of the validity of the motion, must "take

---

[4]We recognize that in State v. Johnson, 762 S.W.2d 110 (Tenn. 1988), the Tennessee Supreme Court addresses State v. Mathis, stating:

Tenn. R. Crim. P. 29(a) clearly and explicitly provides that if a defendant's motion for judgment of acquittal at the close of the evidence offered by the State is not granted, the defendant may offer evidence without having reserved the right. Criminal Procedure Rule 1 specifically provides that "These rules govern the procedure in all criminal proceedings conducted in all courts of record in Tennessee." Any case law to the contrary has been specifically preempted by the rules.

Id. at 115. When addressing a petition to rehear by the State, the Court stated:

We do not mean [by this statement] to imply that a defendant does not waive a motion for acquittal made at the end of the State's proof by not standing on his motion and proceeding to offer evidence. See State v. Thompson, 549 S.W.2d 943, 945 (Tenn. 1977). We do not think our original opinion raises that connotation.

Johnson, 762 S.W.2d at 121.

affirmative action to confine the controversy to the proof already presented." Id. The defendant's counsel should, among other things, announce that the defendant stands on his motion and will present no proof. Id. If the defendant does not do so, his actions waive the trial court's error. This Court was asked, but declined, to overrule Mathis and its progeny. See State v. Walker, 713 S.W.2d 332, 333 (Tenn. Crim. App. 1986).

In the case under submission, applying the aforementioned law, we conclude that the Defendant waived the trial court's error by presenting evidence on his own behalf. Therefore, the trial court could not properly rule on the Defendant's motion for judgment of acquittal at the motion for new trial hearing. Our inquiry, however, does not end there.

Tennessee Rule of Criminal Procedure 29(a) empowers a trial court sua sponte to order the entry of a judgment of acquittal after the close of the evidence on either side "if the evidence is insufficient to sustain a conviction of [the charged] offense." Tenn. R. Crim. P. 29(a). The Rule goes on to allow a trial judge to reserve decision on a motion for judgment of acquittal made at the close of all the evidence until after the jury returns a verdict. Tenn. R. Crim. P. 29(b). The issue before us becomes what is the effect of the trial court's decision, made after the jury's verdict of guilt, to grant a motion of acquittal that was made by the Defendant at the close of the State's case but "mistakenly" not ruled upon. As previously stated, to take under advisement a motion for judgment of acquittal made by the Defendant at the close of the State's evidence is error. However, we find nothing in Rule 29 that prohibits the trial court from sua sponte ordering the entry of judgment of acquittal after all the evidence has been presented from both sides and the jury returns a verdict. It is the duty of the trial court to do so if the evidence is insufficient to sustain a conviction. We therefore choose to view the trial court's judgment of acquittal as to the charge of attempted first degree murder as a sua sponte order that is within the authority of the trial court pursuant to Rule 29.

The distinction between a Rule 29 motion and Rule 33(f) motion becomes important to our inquiry. In State v. Dankworth, 919 S.W.2d 52, 55 (Tenn. Crim. App. 1995), this Court explained, "There are important distinctions between the setting aside of a verdict under Rule 33(f) and a judgment of acquittal under Rule 29 of the Tennessee Rules of Criminal Procedure." Id. at 56. This Court said:

> To resolve a motion for a judgment of acquittal under Rule 29, the trial court must examine the sufficiency of the evidence. . . . If the trial judge determines that the evidence is insufficient to support a jury's guilty verdict beyond a reasonable doubt, a judgment of acquittal is granted. The state may not retry the defendant but has the right of appeal.

Id. at 56 (citations omitted). A motion for judgment of acquittal presents a question of law. State v. Gillon, 15 S.W.3d 492, 496 (Tenn. Crim. App. 1997). The trial judge is concerned only with the legal sufficiency of the evidence and not the weight of the evidence. Id.

Conversely, Rule 33(f) requires the trial judge to independently weigh the evidence and assess the witness' credibility. The trial judge must be personally satisfied with the verdict. Dankworth, 919 S.W.2d at 56. This rule imposes upon the judge the mandatory duty to serve as the thirteenth juror in every criminal case, and approval by the trial judge of the jury's verdict is a necessary prerequisite to the imposition of a valid judgment. State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). If the trial court disagrees with the jury about the weight of the evidence, the proper remedy is for the trial court to order a new trial. Gillon, 15 S.W.3d at 500. Accordingly, the State may retry the defendant for the charge.

In the case under submission, we conclude that the trial court did not err when it sua sponte determined that a judgment of acquittal was appropriate as to attempted first degree murder because the evidence was insufficient to support the jury's finding of premeditation. By so doing, the trial court precluded the State from retrying the Defendant on the charge of attempted first degree murder. We disagree that the trial court had no ability to grant a sua sponte motion for judgment of acquittal. Further, we agree with the trial court that the evidence was insufficient to support a finding of premeditation. The Defendant is, therefore, not entitled to relief on this issue.

## 2. Rule 29 Motion for Attempted Second Degree Murder

The Defendant asserts that the trial court erred when it denied his motion for judgment of acquittal for the charge of attempted second degree murder. The Defendant implies that because the trial court granted the judgment of acquittal as to the conviction of attempted first degree murder the trial court had no option but to grant an acquittal of all the lesser-included offenses.

Our review of this issue is the same as our review of the issue of whether the evidence is sufficient to sustain the Defendant's conviction for attempted second degree murder. See State v. Price, 46 S.W.3d 785, 818 (Tenn. Crim. App. 2000). As we previously concluded, the evidence presented at trial, viewed in the light most favorable to the State, is sufficient to support the Defendant's conviction of attempted second degree murder. He is, therefore, not entitled to releif on this issue.

## D. Rule 33(f) Motion

The Defendant next asserts that the trial court erred when it denied his motion filed pursuant to Tennessee Rule of Criminal Procedure 33(f). The Defendant contends that, if he waived his motion for judgment of acquittal by not standing on it or objecting to it being taken under advisement, then, in the face of evidence insufficient to support the jury's finding of attempted first degree murder, the trial court's only recourse was to order a new trial as the thirteenth juror. The Defendant goes one step further and contends that the evidence is also insufficient to support the jury's finding that he acted "knowingly," and, therefore, the trial court should have granted his motion for new trial on a charge no greater than attempted manslaughter. Because we previously concluded that the Rule 29 motion for judgment of acquittal was properly before the trial court based upon its own motion, we now review whether the trial court erred when it denied the Defendant's motion for new trial.

The trial court granted a motion for judgment of acquittal as to the conviction of attempted first degree murder, and it allowed a conviction of attempted second degree murder to stand. Therefore, the issue properly before the court was whether a motion for new trial should have been granted as to the Defendant's conviction for attempted second degree murder. With respect to this issue, the trial court found:

> [T]he court considers the guilt of the Defendant on the attempt to commit murder in the second degree. And after considering the proof, this Court is of the opinion that the Defendant is guilty of attempted second degree murder and is in agreement with the jury in that regard. That verdict will stand.

Appellate courts are ill-suited to assess whether the verdict is supported by the weight and credibility of the evidence. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995). For that reason, in Tennessee, the accuracy of a trial court's thirteenth juror determination is not a subject of appellate review. Id.; State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). Instead, once the trial court approves the verdict as the thirteenth juror, appellate review is limited to determining the sufficiency of the evidence. Burlison, 868 S.W.2d at 719. In the case presently before us, we have determined that the evidence is sufficient to sustain the Defendant's conviction. He is not entitled to relief on this issue.

### E. Pro Se Motions

The Defendant, while represented by counsel on appeal, has submitted several pro se letters of correspondence to this Court attempting to supplement the record on appeal and to amend his appellate brief to add additional claims. However, the Defendant is represented by counsel, and it has long been our rule that a Defendant has no right to be represented by counsel in this Court and simultaneously proceed pro se. See State v. Burkhart, 541 S.W.2d 365, 371 (Tenn. 1976); State v. Cole, 629 S.W.2d 915, 917-18 (Tenn. Crim. App. 1981). Furthermore, the subjects of these motions are more properly addressed by a post-conviction petition filed in the trial court. Accordingly, the Defendant's pro se motions are denied, and all improperly submitted evidence and testimony has not been considered by this Court in its adjudication of this case.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE